UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHOW ANN CHEN,

              Plaintiff,

-vs-

THE DOW CHEMICAL COMPANY,

              Defendant.

_____/

CASE NO. 07-CV-10275

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant The Dow Chemical Company's ("Defendant") December 18, 2007 Motion for Summary Judgment. (Doc. No. 18). Plaintiff Show Ann Chen ("Plaintiff") filed a Response on January 21, 2008. The Court held a motion hearing on March 11, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's motion.

I.      BACKGROUND

This case arises from Plaintiff's allegations that she was terminated from her employment based upon her race, and in retaliation for complaining to her employer about racial discrimination.

Plaintiff, an Asian-American, was born in Taiwan in 1949, and immigrated to the United States in 1975. (Pl. Br. Ex. 1, Chen Dep. 4). Plaintiff began working for Defendant as a "receivables specialist" at Defendant's Auburn Hills, Michigan office in 1998. (*Id*. at 40). At the

1

Auburn Hills location, Plaintiff was responsible for handling collections and resolving account discrepancies for Defendant's automotive customers. (*Id*. at 40-41).

During May 2004, pursuant to a company-wide reorganization, Plaintiff was transferred to Defendant's Midland, Michigan location. (*Id*. at 41-42). Part of Defendant's reorganization included the changing of the duties of receivable specialists. Instead of handling both the collections and discrepancies aspects of a customer account, Defendant assigned its accounts to teams of two, where one team member would handle the collections, and the other discrepancies. (*Id*. at 42-43; Pl. Br. Ex. 2, Baker Dep. 9-10, 49-50). In Midland, Plaintiff was the only Asian-American in her department. Brenda Baker, a white woman and a Payment Receipt and Handling Team Leader, became Plaintiff's direct supervisor. (Baker Dep. 21).

Mary Van Tol, a white woman, also transferred from Auburn Hills at the same time during the reorganization, became Plaintiff's teammate. (Pl. Br. Ex. 9, Van Tol Dep. 20). Plaintiff and Van Tol were assigned to the automotive group, and the other team consisted of Laura Shibilski and Mary Hackett. (Baker Dep. 44). Plaintiff's team's principal accounts consisted of General Motors and Chrysler. (Chen Dep. 44-45).

Baker was in charge of organizing the receivable teams on the basis of the employee's experience level, familiarity with the accounts, and workload. (Baker Dep. 53). However, Baker did not make the decision to put Plaintiff and Van Tol together – she testified that other managers recommended that they be paired together. (*Id*. at 67). Baker's supervisor, Cathy Brubaker, ultimately approved the assignments. (*Id*. at 53, 61). Baker stated that it was her policy only to break up teams for "business reasons" – and not for intra-team personality conflicts. (*Id*. at 69).

Plaintiff stated that Baker allowed Plaintiff and Van Tol to continue their former work arrangement from Auburn Hills until July 2005. (Chen Dep. 77-78). Baker testified that Plaintiff and Van Tol were made aware of the proper Midland work processes and procedures, but left it to them initially to "work it out." (Baker Dep. 107-112).

Plaintiff testified that it appeared to her that Baker gave preferential treatment to Van Tol based on the following observations: (1) Baker stopped by Van Tol's desk every week to "chit-chat"; (2) Baker selected Van Tol as the "social committee" for the department; (3) Baker had Van Tol send out all of the "organization announcements." (Chen Dep. 68-72).

Baker stated that before coming to Midland, she only knew Van Tol through Defendant's "best practices" meetings, where the Auburn Hills employees would join via conference call. (Baker Dep. 79). She also testified that she did not socialize with Van Tol outside of work. (*Id*. at 282). Van Tol similarly stated that she did not know Baker before transferring to Midland. (Van Tol Dep. 67-68).

Plaintiff further testified that she repeatedly complained to Baker that she had a disproportionate workload and that Van Tol was not performing her job adequately. (Chen Dep. 74-76). However, Plaintiff stated that she never complained to her superiors about Van Tol's performance. (*Id*. at 86). Baker did not recall hearing Plaintiff complain about Van Tol. (Baker Dep. 122). In regards to Van Tol, Plaintiff testified:

> Q:    And I guess where we dropped off was how do you know that? How do you know that when you filed this complaint in January of 2007?
> A:    Because [Baker] always put the pressure on me, just me [--] everything and something wrong it's me. [Van Tol] was okay, you know. She was happy. She come in late, left early and a lot of vacations, a lot of sick day [sic]. She had no problem. It was always me who have to go to Mary Van Tol and apologize. It was me have to beg Mary Van Tol to approve me to do this or

that. You know, she is not my supervisor, but she act like my supervisor. I have to get her approval before I can do my job.

Q: This is [Van Tol] telling you that she needed to approve things that you did?

A: Yeah, well, from, her email to me is, "You can't do this. This is not right." When she says that I am in trouble, she go to [Baker] and I got all kind of problem from [Baker], so I mean –

. . . .

A: When [Van Tol] doesn't like what I do she went to [Baker].

(Chen Dep. 117:12-25, 118:1, 11).

In terms of her own work performance, Plaintiff testified:

Q: All right. And you felt it was in the best interest of the company to do things the way you had been doing them because you thought that was most effective, right?

A: It's yes and no, but I don't know how to say it to you.

Q: Okay. Well, explain it to me then.

A: I still do whatever [Baker] ask me to do. If she say, "Okay. Use this report," and I use that report, but I think the other way – because I try her way and it didn't work so I had to do both ways to get job done. I do her way and I tell her that, "I use this report. It did not get the result." In all my email I say that to her too. I did her way. I do everything she asked me to do. You know, I wouldn't worry about it if I can do her way. I'd be happy to do her way.

Q: Is it your perception that [Baker] was the only one in your department who believed that your performance was deficient?

A: Yes.

(*Id*. at 124:2-18).

In early May 2005, Defendant conducted a Sales Adjustment Audit, which was randomly conducted on receivable specialists to ensure that sales adjustments were not issued without proper approvals and whether the employee was following Defendant's internal requirements. The Audit revealed that: (1) Plaintiff was not following the standard work practice of bringing past due accounts to the attention of Defendant's "seller" on the account; (2) that Plaintiff had used a "blanket approval" that had only been approved for General Motors for other customers as well; and (3) Plaintiff was not properly logging information into Defendant's computer

4

systems.

Plaintiff testified that blanket approval mentioned in the Performance Review only happened on one occasion and that she did not have time to log properly information into Defendant's computer systems. (*Id*. at 62-65)

Baker met with Plaintiff on May 3 and 4, 2005, to discuss the Audit results. As a result of the discussions, Baker required that: (1) Plaintiff retake a portion of the Payment Receipt and Handling Training Class; and (2) Plaintiff meet with Baker on a bi-weekly basis to review Plaintiff's understanding of the sales adjustment process. (Def. Br. Ex. 1, 5/6/05 Email). On May 6, 2005, Plaintiff sent an email to Baker acknowledging that Plaintiff needed to take the corrective action suggested. (*Id*.).

By May 20, 2005, Van Tol testified that she "didn't have an opinion" on whether Plaintiff and she were getting along at work. (Van Tol Dep. 66).

On July 7, 2005, Plaintiff and Van Tol got into an argument that resulted in Plaintiff requesting to switch teammates. (Def. Br. Ex. 4, Baker Notes). On July 8, 2005, Baker talked to several of the witnesses of the altercation. (*Id*.). Baker then "touched base" with Van Tol, who was "concerned" with the way Plaintiff handled herself. (*Id*.). Baker then met with Plaintiff to discuss the incident. (*Id*.).

On July 20, 2005, Baker held a meeting with Plaintiff and Van Tol, at which interpersonal effectiveness, teamwork, and their relative job duties were discussed. (Def. Br. Ex. 5, 7/21/05 Email). Baker's July 21, 2005 follow-up email further attempted to clarify their respective job roles. (*Id*.; Baker Dep. 112). Baker testified that Van Tol had approached her

before the meeting, complaining that Plaintiff would not "give up" the discrepancy side of the General Motors account. (Baker Dep. 129).

The night after the meeting, Plaintiff then requested a follow-up meeting with Baker. On July 21, 2005, Baker met again with Plaintiff. According to Baker's notes, they discussed, inter alia: (1) the fact that Plaintiff felt "disrespected" by Van Tol; (2) the fact that Plaintiff stated that she had to work overtime to help Van Tol with the latter's discrepancies; (3) the need for "on-going, clear communication" between Plaintiff and Van Tol; and (4) Baker's concern about Plaintiff's performance in the areas of interpersonal effectiveness and sales adjustment work process. (Baker Notes).

Plaintiff indicated to Baker that she wanted to switch partners. (Chen Dep. 87-88). Plaintiff testified that other teams were allowed to switch partners, although Plaintiff listed the names of several other receivable specialists who were switched, she did not know whether Baker switched any teammates specifically for personality conflict reasons. (*Id*. at 88-104). Plaintiff stated that Baker never responded to her request to change teammates. (*Id*. at 105-06).

On July 22, 2005, Baker spoke with Plaintiff regarding a customer complaint about a stop payment request. (Baker Notes). Baker ordered Plaintiff to stop contacting the customer about it. (*Id*.). Baker and Plaintiff also discussed the possibility of using the Employee Assistance Program ("EAP"), if she needed it. (*Id*.).

On July 25, 2005, Baker e-mailed Plaintiff a reference to the EAP. (*Id*.; Baker Dep. 170).

On September 20, 2005, Baker met with Plaintiff and encouraged her to utilize the work process coach Susan Jatczak. (Baker Notes). The next day, Baker held a meeting with both Plaintiff and Van Tol, and then met with Plaintiff afterwards to discuss the work progress. (*Id*.).

At the individual meeting, Baker noted her discussion with Plaintiff regarding Plaintiff's performance feedback that Plaintiff provided for Van Tol:

> I also discussed with [Plaintiff] the performance feedback she provided on Mary Van Tol. [Plaintiff] made reference in her feedback regarding [Van Tol] as "a typical American that has no patience to details." I provided [Plaintiff] with a copy of the Respect & Responsibility guideline and let her know that it is not appropriate nor is it in line with [Defendant's] Respect & Responsibility to make reference to one's ethnicity. [Plaintiff] mentioned that she was in a hurry and didn't mean to write the comment. She advised she was sorry.

(*Id.*). Plaintiff testified that she did not intend to make that comment, but was simply relating what Defendant's salesman Mike Donlinski said about Van Tol. (Chen Dep. 48-50).

On November 30, 2005, Baker and Plaintiff met to discuss "workload concerns, status of payment discrepancies." (Baker Notes). Baker advised Plaintiff to work with Jatczak, and to meet again in approximately two weeks to review the results of the sales adjustment review. (*Id.*).

In January 2006, Baker completed Plaintiff's 2005 Performance Review. (Def. Br. Ex. 2, 2005 Performance Review; Baker Dep. 146-47). The following comments were included in the "Leader Summary of Performance Feedback":

> [Plaintiff,] you are able to obtain very good results in your collection efforts. However, you need to improve "how" you achieve your results by developing your global and functional competencies. Team work, interpersonal effectiveness, work process effectivness [sic] and systems & technology are areas which require improvement. Improvement in these areas will make you more effective and efficient. Results will come much easier once these areas are improved.
>
> . . . .
> [Plaintiff,] by improving your competencies as outlined above, you'll become more efficient and will be able to complete more tasks more efficiently and effectively. As a result, you will add more value. You clearly care about obtaining superior results for [Defendant]. You are dedicated and a very hard worker.

(2005 Performance Review).

Around the same time, Van Tol received her 2005 Performance Review. (Pl. Br. Ex. 13). The review instructed Van Tol to: (1) continue to develop her knowledge of the systems and technology; and (2) follow work processes to become more efficient.[1] (*Id.*).

On February 8, 2006, Baker indicated that she delivered the 2005 Performance Review to Plaintiff. (Baker Notes). Baker noted that Plaintiff "wanted to debate a variety of the comments included in her feedback and stressed that she has a very high percent current." (*Id.*). The next week, Baker recorded that Plaintiff repeatedly expressed her view that she should have received a better review. (*Id.*). Baker "[i]nformed [Plaintiff] that she needed to accept accountability for her results and move forward vs looking at the past." (*Id.*).

On February 12, 2006, Plaintiff sent an e-mail Baker's supervisor Brubaker stating that Plaintiff believed that Baker should have given her a better review. (Def. Br. Ex. 6, 2/12/06 Email). Plaintiff stated that she "need[ed Brubaker's] help since [Baker] and [Plaintiff] did not agree with the method used to collect the money I want to clarify the method I used." (*Id.*). Brubaker responded to Plaintiff that they could set up a meeting. On February 13, 2006, Brubaker forwarded her response to Baker. (*Id.*).

On March 27, 2006, Baker received a copy of an email from Plaintiff to Terry Radcliff, Defendant's seller for the GM account:

> Received a copy of an email from [Plaintiff] to Terry Radcliff, seller for GM. [Plaintiff] reminded him "I still need your help, you said when this is over you will do something. I need something done for me because I worked so hard for

---

[1] Van Tol's 2006 Performance Review completed by her new supervisor Kristi L. Feinauer was less than glowing. (Pl. Br. Ex. 14, 2006 Performance Review). Van Tol received an overall "needs improvement" rating (the second lowest of four categories). Van Tol also went on a Performance Improvement Plan in March 2007 for lack of understanding of the systems, lack of leadership, and a perception that she took too much time away from work. (Id.).

[Defendant] for the whole year of 2005, I did what was good for [Defendant.] I contributed the most and obtained the highest result in the company but I received the opposite award. I feel it wasn't fair, yet I accepted the accountability. However, I still believe if business recognize [sic] my efforts and spread the message out that I am a good [Defendant] employee, a good worker and a valuable worker. My work knowledge and methodology used is a good way not a bad way. I need something like this badly. Will you be able to give me a hand?" [Plaintiff] further states in her email "My problem here is I have to listen to someone with less experience but they think I was wasting time doing the spreadsheet. After listening to them that didn't work, I need to go back to still working on manual spreadsheet to collect [Defendant] money. Can you feel how much grief I swallow? If it is possible, please don't forget to do something good for me (in a way that those people causing me suffering know about it and stop doing it to me and make it up for me – I don't intend to fight." Terry responded stating that he will submit an award request for her as promised.

(Baker Notes).

On April 13, 2006, Baker set up a meeting with Plaintiff to discuss a proposed "Performance Improvement Plan" (PIP). However, the notes indicate that "[Plaintiff] diverted the meeting to workload and roles and responsibilities of her and Mary. [Plaintiff] also dwelled on her performance in the past." (*Id*.). Baker testified that "[a]s far as I [was] concerned, [Plaintiff] was on a Performance Improvement Plan, this formalized it." (Baker Dep. 193:8-9). Baker also established improvement plans for Sarah Stone, Melanie Walczak, and Dawn Burrell. (*Id*. at 189-92). Baker stated that performance improvement plans "last until the employee is able to demonstrate improvement" and that Plaintiff did not subsequently follow the plan "consistently." (*Id*. at 208-09, 215). Baker and Plaintiff met "frequently" on Plaintiff's progress. (*Id*. at 223-24).

Plaintiff's performance improvement plan focused upon improving: (1) her knowledge of Defendant's systems because of her failure to pass the internal sales adjustment audit; (2) her teamwork; and (3) interpersonal effectiveness. (Pl. Br. 15, 4/13/06 Performance Improvement Plan).

On April 21, 2006, Baker met with Plaintiff and Van Tol to "clarify who does what." After the meeting, Baker met with Plaintiff separately in order to "finalize goals." However, Baker noted that:

> [Plaintiff] wanted to talk about her workload and feels her workload is larger than others. I explained that it is comparable to others on the Plastics team and we cannot just look at A/R and number of accounts. I explained to her that she needs to focus on following the work process and utilizing the system and tools to be more efficient and effective. (i.e. create things via BO reports vs manual, etc). [Plaintiff] advised me that she feels I treat her "differently" than others. I informed her that I treat everyone the same and utilize the same Performance Management/calibration process across the entire RS team. We did not finalize our goals again. [Plaintiff] was frustrated because she feels that I spend more time w/others in setting their goals. I explained to her that I completed goals with all others in one-30 minute meeting.

(Baker Notes).

On April 27, 2006, Baker and Plaintiff reviewed the new Sales Adjustment Audit findings. Although Plaintiff improved over previous years, Baker noted the following: (1) Plaintiff needed to focus upon standard written procedures and the work process coach; (2) one of Plaintiff's customers refused to work with her any longer, citing that her phone calls were coming across like a "collections" agency; and (3) Plaintiff needed to improve communication and teamwork. (*Id*.).

Beginning in May 2006, Baker asked Shibilski to assist Plaintiff in better understanding the work process. (Pl. Br. Ex. 31, Shibilski Dep. 27). Shibilski testified that she met with Plaintiff on Thursdays until the beginning on June 2006. (*Id*.). Shibilski also coached the new hire Tameka Johnson during this period. (*Id*. at 33).

On May 14, 2006, Plaintiff sent Baker a lengthy email attempting taking issue with the results of the sales adjustment audit and raising other issues discussed at the April 27 meeting. (Pl. Br. Ex. 17, Emails). In that email, Plaintiff stated that "[m]y leader has not heard my voice . .

. . I was not given a human right opportunity." (*Id.*). Plaintiff further complained that other employees were doing similar processes, but were not singled out. (*Id.*). Sarah Kok, Defendant's human resources leader for Customer Service and Supply Chain, instructed Baker not to respond to the email. (*Id.*; Baker Dep. 228).

On May 31, 2006, Baker recorded that she delivered to Plaintiff an "expectations letter" (Baker Notes). The letter stated:

> Over the last several months we have had several discussions concerning performance issues and have made several attempts to help you improve your performance in your work as a Receivables Specialist. Specifically, we have on several occasions reminded you of your need to improve your Interpersonal Effectiveness, Teamwork and Work Process and Systems & Technology Effectiveness competencies. These competencies are critical and must be met by you to effectively perform your current job requirements.
>
> As of today, you have not demonstrated that you have accepted accountability for your performance as outlined in your 2005 Performance Review and corresponding Improvement Plan. Additionally, sufficient performance levels in the areas identified have not been demonstrated. Lack of improvement in each of these areas adversely impacts your ability to function effectively as a Receivables Specialist. As such, your failure to make these necessary improvements, as well as your failure to achieve and maintain an acceptable level of performance overall will lead to further disciplinary action, up to and including immediate separation from employment.
>
> Beginning May 31, 2006, you will responsible for scheduling and attending bi-weekly meetings and working directly with me to review your progress in fully meeting your job requirements and achieving and maintaining an acceptable level of overall performance. I will be available beginning immediately to provide coaching and help with any questions or concerns.
>
> Ann, we want you to be successful. Only you can do what is necessary to insure your success. We are asking you today to accept personal responsibility for your performance and initiate the necessary permanent change.

(Def. Br. Ex. 8, 5/31/06 Letter). Baker testified that the decision to terminate Plaintiff had not been made as of May 31, 2006. (Baker Dep. 221).

During the morning of June 1, 2006, Shibilski sent two e-mail "updates" on Plaintiff's work activities.[2] (Def. Br. Ex. 10, 6/1/06 Emails). The information relayed included: (1) Plaintiff had "abandoned" the work process; (2) Plaintiff was working inefficiently without explanation; and (3) Shibilski had the impression that Plaintiff was "lying" to fit her agenda. In the follow-up email, Shibilski stated that she had to show Plaintiff "all over again" part of the work process, and asked if "there [was] a reasonable limit to the number of times we show her things before turning on tough-love[.]" (*Id.*). Baker noted that Shibilski was "frustrated at [Plaintiff] because she invested a lot of time showing her best practices for managing the workload, etc., however [Plaintiff] has failed to implement anything to date." (Baker Notes). Shibilski testified that at this point, Plaintiff kept asking her for help in convincing Baker either to switch accounts or teammates. (Shibilski Dep. 35). Shibilski explained that she used the term "tough love" in the e-mail since she had shown Plaintiff the process five or six times, yet Plaintiff would then revert to her own way of doing things. (*Id.* at 39-40).

On June 1, 2006, Plaintiff requested a meeting with Kok to discuss the letter and her performance. (Baker Notes). Kok noted that at the June 1 meeting, Plaintiff "made no references to being treated unfairly due to [her] culture or [her] age." (Def. Br. Ex. 11, 6/14/06 Letter). However, Kok was aware that Plaintiff had made comments of this nature to her co-worker. (*Id.*). Kok indicated in an email to Baker that Kok "trust[ed Baker's] assessment as [Plaintiff's] manager." (Pl. Br. Ex. 29, 6/1/06 Email).

By June 2, 2006, Baker stated that she had the impression that the decision to terminate Plaintiff had been made. (Baker Dep. 239). Kok testified that a decision to terminate Plaintiff

---

[2]     Baker confirmed that Shibilski, Van Tol, and Jatczak from time to time provided her with "unsolicited" analyses of Plaintiff's performance. (Baker Dep. 166-68).

had not been made by that time. (Kok Dep. 45). However, on June 2, 2006, Kok sent an email to

Baker stating in part that Kok was "leaning towards severance since [Plaintiff] did state that she

is not trying to do a bad job – she is trying." (Pl. Br. Ex. 33, 6/2/06 Email).

On June 7, 2006, Kok met with Plaintiff to discuss the race and age allegations. (6/14/06

Letter). Kok noted in a letter dated June 14, 2006 to Plaintiff that had expressed to her that

Plaintiff "felt [she was] being treated unfairly because [she] didn't agree with Brenda's

assessment of [her] performance but that the assessment and treatment from Brenda had nothing

to do with her culture or age." (*Id*.). Kok referred Plaintiff to the Diversity & Inclusion group if

she had further concerns. (*Id*.).

On June 14, 2006, at 4:20 p.m., Plaintiff called anonymously to a confidential ethics

hotline to report discriminatory behavior by Baker. (Def. Br. Ex. 13, Memorandum).

Defendant's ethics hotline was administered by an outside independent agency retained for that

purpose. (Pl. Br. Ex. 23, Kok Dep. 19-20). At that time, Plaintiff reported that "Baker shows

preferential treatment to the employees she likes. . . .  For example although there are several

ways to complete a given task, Brenda reprimands the employees she doesn't like when they

don't use the procedures she prefers." (*Id*.).

The same day, at 11:24 p.m., Plaintiff sent an e-mail from work to Kok, stating that

Plaintiff did in fact believe that she was being discriminated against on the basis of race and age,

since "other employees . . . . had the opportunity to change teammate or switch accounts." (Def.

Br. Ex. 12, 6/14/06 Email).

At 12:31 a.m., Plaintiff made a follow-up call to the ethics hotline. (Memo). Plaintiff

stated: (1) that Baker "immediately 'writes off' monies that should be collected without making

an effort to collect the funds"; and (2) that Plaintiff wanted "each employee individually interviewed in regards to Brenda's abuse of power." (*Id.*).

On June 15, 2006, the complaint was referred to Pat McDonald, Defendant's Diversity Compliance Implementation Leader. (*Id.*; Pl. Br. Ex. 21, McDonald Dep. 5). Before receiving the ethics line complaint, McDonald was informed by Kok that Plaintiff had made similar allegations to her. (Def. Br. Ex. 14, Investigative Summary; McDonald Dep. 9). Kok told McDonald that Plaintiff had mentioned her concerns that she was being discriminated against on the basis of race and age during her performance improvement meeting with Kok. (McDonald Dep. 23). McDonald combined the ethics line complaints and Kok complaints for the purposes of her internal investigation.

On June 16, 2006, McDonald interviewed Plaintiff for a "couple of hours" about her complaints of race and age discrimination. (*Id.* at 8-9, 11). McDonald then gathered more "background information" from Kok before interviewing Baker. (*Id.* at 42-43). At the interview with Baker, McDonald recalled discussing Plaintiff's performance and whether Baker permitted teammate switches based on personality conflicts. (*Id.* at 45, 60-61). McDonald further testified that she discussed with Baker and Shibilski Plaintiff's belief that Van Tol was not doing her job. (*Id.* at 52-53, 55).

Plaintiff testified that during the internal investigation, Baker was "nice" to her, and after the investigation concluded that Baker became "harsh":

> Q:     Now, are you personally aware of anything other than the fact that your
>        termination occurred after you filed the first charge of discrimination that
>        leads you to believe that your termination had anything at all to do with the
>        fact you had filed the first charge of discrimination?
> A:     Yes, because I notice [Baker] when I file discrimination she will be very nice

to me and then when I receive this nothing found, there is not discrimination found against you – oh,  I should say the opposite way. When I filed discrimination she know that I filed discrimination she, like, was, you know, upset. Remember we have several meetings about my performance improvement plan?

Q:    Yes.

A:    Every time I go to a meeting and update she never talk about actually what I need to improve. We just chitchatting about, you know, what happened at work, something like that. We don't specifically go there and update, just say, you know, improvement, "You need to do this." Most of the meeting we just talking about general or she would be very upset. When they found there is no discrimination about me she would be happy, just go to the updated meeting. I can tell. She happy because there is no discrimination found. And then when that's – you know, I would have more complaint or discipline from her every time it is a different stage.

(Chen Dep. 135:17-25, 136:1-16).

On June 19, 2006, Plaintiff e-mailed McDonald, stating that "Brenda is trying to fire me before [she] leav[es] this job." (Pl. Br. Ex. 25, Emails). Plaintiff attached to the e-mail a "Comparisons & Findings" spreadsheet, detailing Plaintiff's perception of unequal treatment, i.e. the fact that Plaintiff worked ten hours per day plus weekends, helped Van Tol with her accounts, the denial of Plaintiff's request to switch teammates, the fact that Plaintiff used the same process as the other receivable specialists but was still criticized, and Baker's custom of taking Van Tol's side. (*Id*.). Plaintiff sent several more emails (with Plaintiff's own prepared "analyses" of her work situation) to McDonald (on June 20, 24, 26, 29, 30) attempting to document the instances of "unfair treatment." (*Id*.).

On June 23, 2006, McDonald met with Shibilski regarding Plaintiff's complaints. (Shibilski Dep. 44-45).

On June 29, 2006, McDonald concluded in an internal investigative report to Brubaker and Darrell Zavitz that Plaintiff's allegations were unsubstantiated. (Investigative Summary).

McDonald interviewed seven employees during the course of the investigation. (*Id*.). McDonald testified that she took no role in the ultimate decision to terminate Plaintiff. (McDonald Dep. 70-71).

On June 30, 2006, McDonald responded to Plaintiff regarding the latter's accusations that Baker "immediately wrote off monies" and "abuses power" – indicating that McDonald felt that these were "serious allegations and more detail w[ould] be needed to determine whether this should be followed up with an Audit[.]" (Pl. Br. Ex. 28, Emails).

On July 7, 2007, Plaintiff sent her former supervisor from Auburn Hills, David Brasseur, the following e-mail:

> Thank you very much for all your support, hope my bad time can be over soon.
>
> By talking to other RS, it seems that Mary Vatol (sic) is working with other Automotive RS to isolate me, she is pretty effective. I was advised it seems like a harassment case. However, I try not to think of it. It is useless trying here at [Defendant]. Wish new boss here and pray for a good one (they – i.e. Brenda and Mary may also try to brain wash prior I can get hold of the new boss. Oh, wish God can help me.

(Pl. Br. Ex. 38, 7/7/07 Email). Brasseur forwarded this email to McDonald later that day. (*Id*.).

On July 10, 2006, Kristi Feinhauer assumed Baker's position. (Pl. Br. Ex. 32, Feinhauer Dep. 6). Feinhauer testified that Baker stayed on for several months during the transitional period. (*Id*.). Feinhauer testified she had no involvement in the decision to terminate Plaintiff. (*Id*. at 9-10). Feinhauer did mention that Plaintiff had attempted to talk to her about her situation, and also spoke with Van Tol. (*Id*. at 21-24).

On July 12, 2006, Baker sent Plaintiff a follow-up letter to the May 31, 2006 letter. Baker noted, "I have not seen the significant improvement I hoped and want to ensure that you understand the seriousness of the situation." (Def. Br. Ex. 18, 7/12/06 Letter). Baker indicated

that Plaintiff had until August 7, 2006 to make "substantial improvement."

As of July 14, 2006, Kok confirmed that there were discussions about terminating

Plaintiff. (Kok Dep. 94). That same day, Shibilski forwarded to Kok the following email from

Plaintiff:

> I have been suffering for over a year, since Brenda Baker is trying to fire me over
> this. I determined to fight for my human right.
>
> The day that I almost passed out, remember? I asked you for water? I never told
> anyone. It was from my boss and my teammate – work pressure and unfair treatment.
> She has a way to isolate me from all of our teammates, no one is talking to me in our
> department. Everyone is looking at me with their eyes asking Ann is a problem
> person??!!
>
> Everyone is behind my teammate I wonder why? I am honestly with everyone here
> and sincerely work with everyone, I do everything possible can for my teammate, yet
> she was never happy and never good enough. Constantly talk about me behind my
> back and treat me in a big hole to let me fall in the trap. I had enough, Laura, I want
> my basic human right – respect and equal right. I will still be nice to my teammate
> as professional, however, I will not accept when my right is violated or no respect.

(Pl. Br. Ex. 39, 7/14/06 Email).

On July 20, 2006, Baker responded to several of Plaintiff's emails and indicated that she

still perceived "significant gaps" in Plaintiff's performance. (Pl. Br. Ex. 16, Emails).

On July 31, 2006, Plaintiff filed a Charge of Discrimination with the EEOC.[3] (Def. Br.

Ex. 21, 8/14/06 Fax).

On August 7, 2006, the Employee Review Board, comprising Baker, Kok, McDonald,

Jennifer Manchester (legal), and Bob Meikle (neutral manager), decided to terminate Plaintiff's

employment. (Def. Br. Ex. 19). The ERB made the decision based upon Plaintiff's "gap" in

---

[3]      It is undisputed that Defendant did not discover the filing of the EEOC complaint until
after Plaintiff's termination.

competencies in: (1) teamwork; (2) interpersonal effectiveness; (3) work process; and (4) systems & technology. (*Id*.). The termination was to be effective August 31, 2006.

On August 9, 2006, Plaintiff's counsel sent a letter to McDonald, informing Defendant that Plaintiff had filed an EEOC Charge.

On August 11, 2006, Baker submitted an Employee Information Change Form to human resources. The form indicated that Plaintiff's separation date was to be August 31, 2006, and that the reason for termination was "elimination of position." (Def. Br. Ex. 20).

Upon Plaintiff's termination, Shibilski took over Plaintiff's former accounts. (Shibilski 62). Shibilski performed all of the collections work for both automotive teams in the two months following Plaintiff's termination, while Rebecca Trevino, Johnson, and Van Tol performed the discrepancy aspect. (*Id*. at 63-64). In October 2006, Shibilski was assigned to perform collections on Plaintiff's former accounts, while Van Tol and Johnson did the discrepancy work. The other team then consisted of Trevino and Jodie Levely, a new hire. (*Id*.).

On January 17, 2007, Plaintiff filed her Complaint, alleging the following causes of action against Defendant:

| | |
|---|---|
| Count I: | Title VII Race Discrimination |
| Count II: | ELCRA Race Discrimination |
| Count III: | Title VII Retaliation |
| Count IV: | ELCRA Retaliation |
| Count V: | Intentional Infliction of Emotional Distress |

On December 18, 2007, Defendant filed a motion for summary judgment on all Counts. Plaintiff filed a Response on January 18, 2008.

## II.     ANALYSIS

### A.     Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

**B.    Title VII Race Discrimination**

Defendant contends that Plaintiff cannot demonstrate the fourth prong of a prima facie case of employment discrimination under Title VII. Alternatively, even if Plaintiff could establish a prima facie case, Defendant had legitimate, non-discriminatory reasons for the termination.

To establish a race discrimination claim under Title VII, Plaintiff first must establish a prima facie case. This involves making the following showing: (1) that she is a member of a protected group; (2) that she was subjected to an adverse employment decision; (3) that she was qualified for the position; and (4) that she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007) (citation omitted).

If Plaintiff establishes the prima facie case, then the burden shifts to Defendant to articulate legitimate, non-discriminatory reasons for the adverse employment decision. However,

Plaintiff "can establish pretext by demonstrating that the defendant's articulated legitimate, nondiscriminatory reason either: (1) lacks a basis in fact, (2) did not actually motivate her discharge, or (3) was insufficient to motivate her discharge." *Id*. at 497.

        1.      Replaced by Person Outside the Protected Class

Defendant contends that Plaintiff was not replaced by an employee outside the protected, since her job duties were assumed by Shibilski and other receivable specialists. Plaintiff responds that Shibilski performed all of the collections work for both automotive teams in the two months following Plaintiff's termination, while Trevino, Johnson, and Van Tol performed the discrepancy aspect. In October 2006, Shibilski was assigned to perform collections on Plaintiff's former accounts, while Van Tol and Johnson did the discrepancy work. The other team then consisted of Trevino and Jodie Levely, a new hire.

The Sixth Circuit has held that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.,* 349 F.3d 332, 336 (6th Cir. 2003) (internal quotation marks omitted); *Lilley v. BTM Corp*., 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement").

It is clear that Defendant did a certain amount of reshuffling of employees and teammates in the months following Plaintiff's termination. Before Plaintiff's termination, Shibilski was performing collections work on the other automotive team with Hackett. For two months following Plaintiff's termination, Shibilski did the collections for both her former account and

Plaintiff's accounts. In October 2006, Shibilski was assigned only to Plaintiff's collection accounts, with Van Tol and Johnson doing the discrepancy work. Defendant hired Levely to take Shibilski's former position, with Trevino as her discrepancy partner.

Shibilski performed both of the team's collections work – in other words, she assumed Plaintiff's duties in addition to her own. However, two months later, Defendant hired a new employee to take over Shibilski's former collection accounts, permitting Shibilski to focus solely upon Plaintiff's former accounts.

The Court finds that Defendant's attempted end-around argument does not demonstrate that Plaintiff's duties were simply spread out over the remaining employees. The Seventh Circuit has discussed the Sixth Circuit decision in *Lilley* and provided the following example:

> An employer must not be allowed to get around Title VII, or the *McDonnell Douglas* formula, by fractioning an employee's job. We do not consider *Lilley v. BTM Corp.,* inconsistent with this principle, despite the statement in the opinion that "spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." That was a case in which the employer's workforce was shrinking for reasons unrelated to discrimination. The plaintiff's services were no longer required; he was not replaced. That is different from a situation in which *A* is fired, *B* and *C* are assigned each to do half the work formerly done by *A*, and *D* is hired to do the work of *B* and *C* that they must give up to do *A*'s work. That is replacement, even though *A*'s duties have been split among two (or more) employees.

*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997).

Here, A was fired, and B was assigned to take the work of both B and A. C was then hired to perform B's former work, and B was then assigned to A's former work. Therefore, B (outside of the protected class) has replaced A (member of the protected class).

Therefore, the Court holds that Plaintiff has demonstrated that she was replaced by a person outside of the protected class. Plaintiff has satisfied the prima facie test.

2.      Legitimate, Nondiscriminatory Reasons & Pretext

Defendant contends that even if Plaintiff is able to make a prima facie case of discrimination, it had legitimate, nondiscriminatory reasons for terminating her employment – in this case, poor job performance. Defendant points to the following as evidence of her poor performance: (1) customer complaints regarding her collection tactics; (2) difficulty in her interpersonal relationships; (3) lack of teamwork; and (4) her inability or unwillingness to use Defendant's work processes consistently.

Plaintiff responds that it has established that Defendant's otherwise legitimate, non-discriminatory reasons were "pretext." Plaintiff submits that: (1) Defendant ignored the numerous e-mails and letters of her perceived compliance; (2) since the decision to terminate Plaintiff was made on June 2, 2006, a reasonable inference is that next several months until her termination were simply a "charade."

It is well-established that "[p]oor performance is a legitimate non-discriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 802 (6th Cir. 2007). Furthermore, "[a]n employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor." *Id.*; *Arendale v. City of Memphis*, – F.3d –, 2008 WL 731226, *15 (6th Cir. 2008) ("Conclusory assertions supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment"). Finally, once the burden shifts back to Plaintiff to demonstrate pretext, she must show that the employer did not reasonably rely on "particularized facts that were before it at the time the decision was made." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 713-14 (6th Cir. 2007).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the record does not support a reasonable inference that Defendant's stated reasons were pretext.

Plaintiff and Van Tol appeared to have difficulty initially transitioning to the "Midland" method of performing the accounts receivable position. Baker explained the new process to them, but left it to them to "work it out" among themselves, at least until July 2005. Plaintiff's teammates consistently observed that she had significant problems with interpersonal communications, teamwork, and client relations – and periodically relayed their observations to Baker. Furthermore, it is clear that a major reason why Plaintiff worked late and on the weekends was that she did not effectively or consistently use Defendant's work processes which were intended to save time and effort. According the testimony of Baker, Shibilski, and Plaintiff herself, she would revert to her former inefficient practices, insisting that her way was correct.

Beginning with Plaintiff's failure of the internal sales adjustment audit in the spring of 2005, Baker began to meet regularly with Plaintiff and Van Tol, together and separately, in an attempt to work out the team's problems. Plaintiff insisted to Baker that Van Tol was the problem and requested a teammate "switch." Baker testified unequivocally that she did not switch team members for personality conflicts, and Plaintiff conceded that she was unaware of why other teams were switched.

Plaintiff further wanted to debate constantly the results of her periodic reviews to anyone who would listen. In April 2006, since Baker did not perceive that Plaintiff was improving in the areas of work process knowledge, teamwork, and interpersonal effectiveness, the two developed a PIP to try to get Plaintiff back on track. From April 2006 to her termination, Plaintiff paid lip service to the PIP, and continued to insist that her problems at work were attributable to Van Tol,

that she had an unequal workload, and that her own method of performing the collections function was better than the established work process.

From the beginning of June 2006 until her ultimate termination in August 2006, Baker began to realize that Plaintiff was either unable to unwilling to overcome her well-documented limitations. During June and July of 2006, Plaintiff flooded the email boxes of Baker, Kok, and McDonald with "evidence" that she was doing her job correctly, raising her usual talking points – so much so that they felt the need to stop responding to her e-mails, preferring in-person meetings. Towards the end of June, she was appealing to her former Auburn Hills supervisors and making serious allegations about Baker "abusing power" and "writing off monies." During June 2006, however, Baker, Kok, and McDonald were still willing to meet with her to discuss her concerns, but all got the impression that meetings had become fruitless faced with Plaintiff's insistence on doing things her own way. Shibilski, assigned by Baker to assist Plaintiff with understanding and using time-saving work processes, became "frustrated" because she attempted to show Plaintiff certain aspects of the work process, and Plaintiff would adopt it initially then quickly revert to her own self-devised methods.

At the time of her termination, Plaintiff had been having documented performance problems at Midland since the spring of 2005. Apart from Plaintiff's own view of her effectiveness, there is simply no evidence to support her conclusions that she demonstrated substantial improving in any of the three critical aspects of her job. In fact, the overwhelming record supports that opposite conclusion.

In short, the Court is convinced that the overwhelming record supports the conclusion that Defendant reasonably relied upon sufficient "particularized facts" to discharge Plaintiff.

Therefore, the Court GRANTS summary judgment to Defendant on Plaintiff's Title VII race discrimination claim.

### C.    Title VII Retaliation

Defendant contends that Plaintiff has failed to establish the "causal link" prong of a prima facie case of retaliation under Title VII. Plaintiff responds that she first internally complained of discrimination as early as May 14, 2006, and that there is evidence in the record inferring that Defendant retaliated against her for making complaints to Kok and the confidential ethics hotline.

The Sixth Circuit has summarized the relevant analysis for a claim of retaliation:

> In order to establish a prima facie case of retaliation under this court's Title VII caselaw, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White,* however, made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision. In contrast to Title VII's discrimination provision, the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008) (internal citations omitted).

> "A plaintiff in a Title VII [ ] action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action."
>
> . . . .
>
> When a plaintiff presents only circumstantial evidence, we examine Title VII [ ]

retaliation claims under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination.

*Imwalle v. Reliance Medical Prods., Inc.*, 515 F.3d 543-44 (6th Cir. 2008) (internal citations omitted).

"Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

Plaintiff offers two alternative theories for retaliation: (1) Plaintiff first complained of discrimination on May 14, 2006, when she claimed that she was not given her "human right" opportunity, and Defendant decided to terminate her (according to Baker's testimony) on June 2, 2006; or (2) Plaintiff was ultimately terminated on August 7, 2006, because of her internal complaints filed on June 1, 2006. As evidence of the retaliatory conduct, Plaintiff contends: (1) that the termination had "temporal proximity" to the complaints; (2) Kok attempted to "persuade" Plaintiff in her letter that Plaintiff was not complaining about race discrimination, which Plaintiff later disputed; (3) McDonald conducted a "sham" internal investigation and "threatened" Plaintiff that further complaints would require an "audit."

First, the Court disagrees that Plaintiff's May 14, 2006 e-mail complaining that she was not given a "human right" opportunity constitutes an assertion of a claim of discrimination. The context of the relevant e-mail clearly points to the fact that Plaintiff believed that she was being held to different standards than her co-workers, but not based upon racial discrimination. Furthermore, there is no evidence in the record to support a reasonable inference that Defendant's employees understood that the one pertinent sentence in Plaintiff's e-mail referred

to age or race discrimination. The record clearly demonstrates that the first time Plaintiff complained about possible race and age discrimination occurred at her meeting with Kok on June 14, 2006.

At the outset of the internal investigation, McDonald consolidated the Kok and ethics line complaints. After talking with Plaintiff, Baker, and Plaintiff's co-workers, it became clear to her that Plaintiff had long-term and serious performance problems. Plaintiff attempts to argue that McDonald's internal investigation was a "sham," but fails to point to any evidence supporting that theory. Finally, McDonald's alleged threat of an "audit" referred to Plaintiff's accusations that Baker was "writing off monies" – not to audit Plaintiff.

From the record, Plaintiff's only evidence of retaliation is the temporal proximity, which in itself, is insufficient to show a "causal connection." By the time Plaintiff made her complaints known to Defendant in mid-June 2006, the wheels of her termination had already been set into motion. The email and deposition record do not reveal any evidence that would give rise to a reasonable inference that Plaintiff's complaints were a factor in the ultimate decision to terminate her employment.

Even if Plaintiff has established the "causal connection" prong, as explained above, the Court finds that Defendant has offered non-pretextual legitimate non-discriminatory reasons for Plaintiff's termination.

Therefore, the Court GRANTS summary judgment to Defendant on Plaintiff's retaliation claim.

### D.    State Law Claims

Plaintiff further alleges violation of Michigan's ELCRA, and intentional infliction of emotional distress. While the Court possesses the discretion to exercise jurisdiction over Plaintiff's state law claims, it will decline to exercise that jurisdiction pursuant to 28 U.S.C. § 1367(a) and (c). Considerations of judicial economy in this instance do not support further proceedings to resolve Plaintiff's state law clams. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

## III.	CONCLUSION

For the foregoing reasons, the Court hereby:

(1)	**GRANTS** Defendant's motion for summary judgment on Plaintiff's federal claims; and

(2)	**DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION** over Plaintiff's state law claims.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 31, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 31, 2008.

s/Denise Goodine
Case Manager

28